# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| **Lewisberry Partners, LLC** | : | |
| | : | Case No. 24-11496 (PMM) |
| | : | |
| **Debtor.** | : | |

## O P I N I O N

### I. INTRODUCTION

Everyone decided to leave their homework at home. At issue in this contested matter is the valuation of several townhomes and the amount of the claim secured by that collection of properties. Both parties provided only abbreviated charts and simple, bottom-line figures, making valuation a challenge.

Lewisberry Partners, LLC (the "Debtor") filed this voluntary chapter 11 bankruptcy on May 02, 2024. The Debtor owns and manages developed real estate in York County, Pennsylvania. The largest and only secured creditor is U.S. Bank Trust, N.A. (the "Creditor") whose interest is represented by Fay Servicing, LLC ("Fay"), the loan servicer. The Creditor initially filed its claim for $8,974,912.22, secured by all of the Debtor's real properties as well as other real property owned by the Debtor's principal, Mr. Richard Puleo ("Puleo"), and his wife. See Claims Register, #2.

The precise nature of the Creditor's security interest is complicated by the transactional history between the parties. This is the Debtor's second bankruptcy filing; the Debtor's first chapter 11 bankruptcy was filed February 09, 2021, and ended with plan confirmation on August 04, 2022. The Debtor and its principal initially borrowed $8,025,000.00 to finance the purchase of fifty (50) townhomes (the "Property") in 2019. This transaction was memorialized in a

Commercial Promissory Note.  See Creditor's Exhibit #2-A.  On August 3, 2023, after four failed cramdown attempts, the parties signed a Settlement Agreement ("Agreement") whereby the Debtor would continue to make interest payments and have until August 31, 2023, to pay the loan amount in full, presumably by either rapidly selling properties or by obtaining refinancing. See Creditor's Exhibit #2-B.[1]  The Agreement provided that any proceeds from property sales would be applied to principal if the Debtor was not in default.  Id.  The Agreement also gave the Creditor the option to pursue uncontested foreclosure or record deeds in lieu of foreclosure in the event of a default.  Id.  Additionally, while in default, an interest rate of 23% would apply and any payments made, including property sale proceeds, would be applied first to any outstanding default interest, in accordance with the original loan documents.  Id.

On August 31, 2023, the debt had not been paid in full.  The Debtor and Puleo had managed to sell a few homes and reduce the principal amount to $7,558,480.57.  See Creditor's Exhibit #2-A.  After failing to negotiate a solution with the Creditor, the Debtor attempted to reopen its first bankruptcy in order to seek enforcement of the Agreement and to compel the Creditor to record deeds in lieu and credit the determined value of those properties against the remaining debt.  See Creditor's Exhibit #6, ¶O.  Judge Coleman denied the motion to reopen causing the Debtor to file this present bankruptcy.

Since August 31, 2023, including during the pendency of its filing, the Debtor has continued to sell homes and remit proceeds to Fay.  The Creditor's claim remains secured by thirty-seven (37) unsold single-family homes of varying characteristics.  See Debtor's Exhibit #1; Creditor's Exhibit #1.  The parties disagree on both a fair valuation of the secured property

---

[1] The Settlement Agreement indicates that the Debtor initially took title to thirty (30) of the properties while Puleo, and his wife Lorraine, owned the remaining twenty (20).  See Lender's Exhibit #2; Debtor's Exhibit #14. There is no dispute that the entire debt amount was secured by all fifty (50) homes and personally guaranteed by Puleo.  See id.

and the precise amount of the claim held by the Creditor. A hearing with regard to the conflict was held and concluded on September 25, 2024.

## II. LEGAL STANDARD

Property valuation is not an exact science, and a court has broad discretion in determining value. See In re 210 Ludlow St. Corp., 455 B.R. 443, 447 (Bankr. W.D. Pa. 2011). A court will often be presented with dueling appraisals and must attribute weight to each based on the credibility of the evidence. See In re Patterson, 375 B.R. 135, 141 (Bankr. E.D. Pa. 2007). A court need not adopt a single appraisal in whole but may form its own opinion as to value considering all the evidence presented. See id. at 144 ("In this case, I have considered the appraisal reports and the valuation testimony presented by the two appraisers and Debtor and conclude that the proper values lie between the numbers advocated by each."); In re 210 Ludlow, 455 B.R. at 452 (finding one appraiser's initial value to be more credible but discounting it further based on credible testimony from the opposing appraiser).

Claim valuation is typically controlled by 11 U.S.C. §506.[2] Section 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is

---

[2] The purpose of valuing the claim is unclear due to the contractual relationship between the parties. The Agreement indicates that in the event of a dispute, the court would be called upon to fix the amount owing pursuant to 42 Pa.C.S. §8130. Creditor's Exhibit #2-B, ¶15.2. The parties likely did not contemplate the valuation would take place in a subsequent bankruptcy. The Debtor's motion also equivocates about the purpose of this valuation, asking the Court to "determine the amount of the Secured Claim and/or Disputed Debt in accordance with the Settlement Agreement. Doc. #81, ¶12. The unsettled nature of the valuation makes sense given that the parties disagree about whether the proposed plan will simply implement the terms of the Agreement or impair the Creditor.
   Because both parties agree that "fair market value" is the proper standard and that sale of the properties to an investor is the proper proposed use of the property, it is immaterial whether this valuation is done pursuant to Pennsylvania state law or §506 of the Code. See 42 Pa.C.S. §8103 (in cases of deficiency, "the judgment creditor shall petition the court to fix the fair market value of the property sold."); 11 U.S.C. §506(a) (requiring value be determined "in light of the purpose of the valuation and of the proposed disposition or use of such property.").

> less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

For purposes of §506(a), a valuation hearing may be necessary in order to determine whether a creditor is oversecured or undersecured and to what extent a claim might be bifurcated into separate secured and unsecured claims. See In re Henry, 457 B.R. 402, 404 (Bankr. E.D. Pa. 2011) (citing In re Fareed, 262 B.R. 761 (Bankr. N.D. Ill. 2001). Valuation of secured property may be critical for plan confirmation in determining whether a claim is impaired or whether a class is being treated fairly and equitably. See 11 U.S.C. §1129(b). The Debtor's plan envisions turning over most, if not all, of the secured properties in satisfaction of the secured debt, thereby requiring valuation of the secured claim.

### III. PROPERTY VALUATION

As an initial matter, the proper valuation purpose must be established. 11 U.S.C. §506(a)(1) requires that value be determined "in light of the purpose of the valuation and of the proposed disposition or use of such property." This is a flexible standard and bankruptcy courts have latitude in determining what valuation standard best applies to the facts of the case. See In re Heritage Highgate, Inc., 679 F.3d 132, 141 (3d Cir. 2012).

While normally parties might dispute the proper method of valuation or disposition of the property, the parties here agree that fair market value is the proper standard. The Debtor remains convinced that its eventual plan will simply enforce the terms of the prior Agreement between the parties. That Agreement stipulated that if the Creditor sought foreclosure or recorded deeds in lieu of foreclosure, a court would determine the fair market value of those properties and credit 90% of that value against the Debtor's unpaid debt. See Exhibit #2-B, ¶15.2.

Alternatively, should the Property be turned over to the Creditor or the Debtor's business sold as a going concern, the most likely disposition would be a sale of all the properties to a prospective investor. Both parties' appraisers agreed that the Debtor's best course would be to sell all thirty-seven (37) properties as a portfolio to a prospective investor, and both used methods intended to simulate the market value of such a sale. See Creditor's Exhibit #1, p. iii; Debtor's Exhibit #1, p.2. However, each appraiser applied different methods to determine the fair market value a prospective investor would attribute to the portfolio.

### Debtor's Appraisal[3]

The Debtor's appraiser, Judy Striewig, prepared a report that considered three (3) approaches: a cost approach, a sales comparison approach, and an income approach.

The cost approach determines the value of a property by estimating the cost to construct a reproduction of the property, taking into consideration factors like entrepreneurial incentives and depreciation. Striewig disregarded the cost approach because, in her opinion, attempting to account for the wide variation in age of the houses and multiple forms of obsolescence would be speculative and unreliable.

The sales comparison approach estimates the total value of the property by attempting to predict the sale value of each property by analyzing factors like age, size, and location of the properties, assessing market conditions, and looking to comparable sales. Striewig estimated the average retail price of the houses to be $290,203.00, resulting in a total rounded sum of $10,737,500.00. Striewig then applied a "bulk discount" accounting for real estate taxes, transfer taxes, transfer costs, and a 5% "profit" discount. She assumed that a buyer would continue

---

[3] Information in this section is taken from the Debtor's appraiser report. See Debtor's Exhibit #1.

renting most of the units and use interim rental income to offset extended holding costs incurred while selling the units. After discount, her rounded value opinion under the sale comparison approach was $9,675,000.00.

The income approach estimates the total value by attempting to calculate the maximum rent an owner could derive from the property. This approach calculates rental values based on prevailing rates and accounts for various holding costs like taxes, insurance, and management fees. This method assumes a purchaser would primarily finance the investment and use a direct capitalization method to estimate value. Striewig maintains that most of the properties are being rented at below market rate. She calculated, by increasing rents to the prevailing rate, the property could generate an annual effective gross income of $910,508.00. After deducting expenses and applying a 6.5% cap rate, Striewig arrived at a rounded income approach value of $9,200,000.00.

Because the sales comparison approach yielded the highest number, Striewig concluded that the highest and best use of the property would be to sell the units resulting in a market value of $9,675,000.00.

### Creditor's Appraisal[4]

The Creditor's appraiser, Mike Mignogna, applied a single approach as part of his appraisal process: the modified subdivision analysis approach.

The subdivision analysis begins with a sales comparison approach, akin to the approach taken by Striewig, in order to determine an average home value. This value is then incorporated into a discounted cash flow analysis that attempts to model the income and costs associated with

---

[4] Information in this section is taken from the Creditor's appraisal. See Creditor Exhibit # 1.

selling the homes over a period of years. Future proceeds are discounted to present value at a market-derived rate. The chosen discount rate is based on national real estate and land developer surveys and attempts to reflect expected profits and acceptable levels of risk for such an investment.

Mignogna's sales comparison yielded a starting average home price of $297,000.00. The subdivision analysis was then conducted in six-month periods, with the relative costs and income calculated for each period. The analysis assumed the following: four (4) houses will be sold during each period reflecting an annual absorption rate of eight (8) houses; houses will appreciate at a rate of 1.9804% at the end of each period, reflecting an annual appreciation rate of 4.00%; 7% of house sale value will be incurred as costs for transfer, sales and marketing, sales prep, yearly tax liability of $3,942.00 per unit, and yearly home-owner's association fees of $100.00 per unit; and 80% of any unsold houses will continue to be rented at a static $1,691.00 per month over the course of the investment.

Mignogna's analysis then applies a 12.00% annual discount rate (6.00% per period) to calculate present value. When totaled, Mignogna arrives at a rounded value indication of $8,570,000.00.

## Weight of the Evidence

First, the Debtor's sales comparison approach is unconvincing. Striewig testified that this analysis assumed that a buyer would utilize the property in a hybrid method for several years, continuing to rent while attempting to sell houses as leases expired. Transcript, p. 15. Striewig assumed that the rental revenue would more than offset the carrying costs based on her income approach, negating the need to factor in carrying costs and absorption rates. Striewig admitted

that her sales comparison approach would not be any different if applied to just one property rather than thirty-seven (37). Transcript, p. 25. When pressed on whether her discounting took account of the absorption rate, the estimated three years it would take to profitably sell the properties, she admitted it did not. Transcript, p. 28. Apparently, those calculations had been performed as part of a different analysis but were in the "work file," not in her report. Id. When asked why, she testified that, for simplicity's sake, those calculations were not included in the report and instead a 10% pure discount rate was applied. Transcript, p. 30. Additionally, when pressed on why her appraisal did not include a discount analysis or factor in absorption rate, her reasoning was that "we were told to keep it as simple as possible, do a lot in the work file and express in the appraisal report a summary of [] our analysis just to keep it clear for the Court." Transcript, p. 36. Striewig's explanation for omitting expense ratio and market rent discount factors when calculating the bulk value discount was that those calculation were in her "work papers." Transcript, p. 38. This analysis does not account for the realities of purchasing a large portfolio of properties for re-sale; simply assuming an investor would apply a 5% "profit" discount rather than engage in a discounted cash flow analysis to account for a holding period of several years is quixotic.

The Debtor's income approach is more credible and relatively unchallenged. It appears that many of the homes are currently rented below market value, and it is reasonable to assume that an investor looking to rent out the properties would quickly attempt to raise rents to prevailing rates. However, Striewig testified that the income approach was accounting for "a year or two [] or six months – eight months to a year to actually increase rent to where they should be in the market" but that she would need to "look in [her] file" to know exactly what the calculation was. Transcript, p. 22. Not knowing whether her model assumed it would take six

(6) months or two (2) years to raise rents to market value makes her bottom-line figure less believable. This is especially true given that several of the houses are currently under leases of varying length. Therefore, while the method of analysis is credible, I find the inability to fully explain her discounting process calls Striewig's final figure into question, suggesting that the number may be optimistically high.

The Creditor's modified subdivision analysis approach was reasonable and largely credible. As an initial matter, I find that this approach was proper given the proposed use of the Property. The Debtor attempted to undermine the propriety of using a subdivision analysis because such an analysis is typically performed on undeveloped land and is reinforced by looking to several comparison sales. However, a portfolio sale of thirty-seven (37) developed properties in central Pennsylvania is sufficiently idiosyncratic that neither party had the benefit of comparable sales and thus all approaches will suffer from that same deficiency. Transcript, p. 89. Additionally, Mignogna's reasoning for employing this method was persuasive and I find the subdivision analysis appropriate for estimating how a sophisticated investor would attempt to value the property.

Mignogna's analysis does have three (3) noticeable flaws. First, it assumes that the investor would purchase the property intending to hold some properties for as long as five (5) years yet never raise rents. I credit Striewig's testimony on this point; the actual average rent is $1,691.00 but Striewig's analysis indicated market rent was closer to $2,200.00 and she testified that any reasonable investor holding these properties for five (5) years would attempt to raise interim rents. Transcript, p. 46. Second, Mignogna admitted that his analysis did not use the most recent common level ratio when accounting for tax assessment costs. Transcript, p. 77. Third, while his own charts indicate home value appreciation at 6% annually, his model applies a

conservative 4% annual increase. Transcript, p. 81. While each of the three are relatively small quibbles, in aggregate, they suggest that Mignogna's appraisal undervalues the Property.

Further, Mignogna's explanation for not developing an income analysis is unsatisfactory. Mignogna testified that his analysis does not include an income approach because it was so clear early on that it would not be worth developing, but the "numbers are in [his] work file somewhere." Transcript, p. 72. His conclusion was based on the assumption that rent could not or would not be raised much beyond $1,691.00 per month. Transcript, p. 73. Given that Striewig's income analysis yielded a 9.2-million-dollar appraised value, Mignogna's decision to forego a similar analysis based on an unrealistically low rental rate raises doubt about the thoroughness of his appraisal.

In sum, I find that both appraisers offered largely credible testimony with reasonable bottom-line figures. The credibility of both appraisers is bolstered by general agreement on several factors: Mignogna's average home price of $297,000.00 is actually slightly higher than Striewig's average of $290,203.00, Mignogna applied an absorption rate of eight (8) houses per year compared to Striewig's assumed twelve (12) houses per year, and Mignogna applied a 12% discount in his discounted cash flow analysis compared to Striewig's testimony that she would have applied 11%. Both parties agreed that these decisions of the opponent appraiser were reasonable.

However, both the Debtor and the Creditor were unprepared to defend certain other decisions they made in the appraisal process. Striewig's income approach was reasonable but optimistic about rental values and lacked substantial support for the amount discounted. Mignogna's discounted cash flow analysis was also reasonable but pessimistic about rental rates and home appreciation. To reconcile the strengths and deficits with both appraisals, the property

is properly appraised as the average of Striewig's income approach valuation of $9,200,000.00 and Mignogna's subdivision analysis valuation of $8,570,000.00.

Therefore, I find that the Property has a fair market value of **$8,885,000.00.**

## IV. CLAIM VALUATION

The amount of the Creditor's secured claim is a question of both law and fact. First, the parties dispute whether the Debtor defaulted on the Agreement. Second, if a default occurred, the parties disagree on how subsequent payments were to be applied to the debt. Third, depending on the answer to first two (2) questions, determination becomes a matter of establishing the principal owing when the default rate began and calculating the total interest that has accrued on the debt less post-default payments made.

### Debtor's Default

The issue of the Debtor's default was effectively resolved by Judge Coleman in her decision denying the motion to reopen the Debtor's previous bankruptcy. Judge Coleman found that after the final decree closing that bankruptcy, the Debtor was given an extension period in which to make a loan payoff. "Debtor was unable to pay off the Loan by the maturity date, thereby defaulting on its obligations under the Settlement Agreement." Creditor's Exhibit # 6, ¶L.

The Debtor argues that despite its failure to pay off the loan by August 31, 2023, it was not in default either because the Creditor never sent an official default letter notifying the Debtor of its default or because subsequent payoff statements do not explicitly show default interest

accruing on the account.  See doc. #117, ¶10; Transcript, pp. 122-25.  Neither argument is compelling.

The Settlement Agreement that emerged from the Debtor's first bankruptcy, following several failed cramdown attempts, was the product of protracted negotiation and compromise.  The core of that agreement was that the Debtor had one year to satisfy the loan balance, whether through rapid sales or refinancing, and the Debtor certainly knew that at the time.  Moreover, Creditor's counsel contacted the Debtor's principal, Puleo, on August 29, 2023, alerting him that the loan would mature in two (2) days and inquiring as to his ability to make the payoff.  See Debtor's Exhibit #18.  Puleo responded the next day, admitting that he had not obtained refinancing and that a deal with an investor to sell a block of units had fallen through.  See id. Rather than fulfill his contractual obligation, Puleo hoped that Fay would allow him more time to find refinancing or continue making sales.  See id.  To now claim that the Creditor was required to send an additional letter or issue a warning of default in its statements to enforce its contractual rights is disingenuous.

Because the Debtor failed to pay the loan balance by August 31, 2023, as required under the Agreement, and because the Agreement explicitly makes failure to pay the debt amount an event of default, I find that the Debtor was in default of the Settlement Agreement as of September 01, 2023.

**Effect of Default**

The Settlement Agreement states: "If there is an Event of Default, [] the Default Rate shall go into effect as of said date on the amount then owing hereunder or under the Loan Documents . . . [and] Lender may exercise all of its rights and remedies against the Debtor or the

Puleos as set forth in the Loan Documents as the same may be modified in connection herewith, including without limitation, the Note . . ." Creditor's Exhibit 2-B, ¶16.1. The Agreement establishes a default interest rate of 23% and that in the event of default, proceeds from home sales "shall be applied consistent with the Lender's application of payments clauses in the Loan Documents." See id. at ¶¶10 and 11.7. The Commercial Promissory Note executed June 26, 2019, between the Debtor and the Creditor indicates that "[a]ll payments received will be credited first to late charges and costs hereunder, then to interest accrued at the applicable interest rate hereinafter set forth, with the balance on account of principal." Creditor's Exhibit 2-C, ¶E.

The Debtor argues that proceeds from home sales remitted after default should have been applied to principal, just as they were before the event of default, but offers no evidence why this should be. A plain reading of the contracts before me compels the conclusion that in the event of default, the Creditor was permitted to charge default interest and apply payments in accordance with the original note. Therefore, any payments made after August 31, 2023, could have been appropriately applied first to any outstanding interest rather than principal.

**Present Claim Value**

Establishing the correct claim amount has been difficult in part because the parties failed to provide a clear explication of how default interest was accruing or how the payments were applied.

The parties agree that the principal balance of the loan by October 11, 2023, was $7,558,480.57. See Debtor's Exhibit #15; Creditor's Exhibit 2-A. When asked for a payment history, the Creditor initially provided the Debtor only an abbreviated and unenlightening

spreadsheet showing all payments made in 2024 in a column labeled "Fee Amount/Default Interest" without disclosing what the interest balance was. See Debtor's Exhibit #2. This spreadsheet indicates a principal balance of $7,558,480.57 on October 11, 2023, which remains unchanged as subsequent payments were made. See id. The Creditor's witness, Michael Paterno, a representative of Fay, testified that some payments made after the August 31, 2023, default were applied to principal in error, but Fay did not go back and change it. Transcript, p. 109.

The parties do not agree on the calculation of default interest or how payments after October 11, 2023, should be applied. In anticipation of this hearing, Fay provided the Debtor with multiple payoff statements. Two (2) statements, both dated September 24, 2024, list different payoff amounts: $8,566,584.64 and $8,864,746.23. Neither statement includes details of how the figure was calculated. Paterno testified that Fay is incapable of altering interest rates within their system and therefore, when an account goes into default, someone must manually calculate accrued default interest and generate a payoff statement. Transcript, pp. 117-18. He testified that the discrepancy in the statements was the product of human error and that the previous statement failed to subtract certain interest payments. Id. The Creditor submits that the most recent payoff statement correctly states the payoff amount at $8,566,584.64. See Creditor Exhibit #4.

The Debtor initially asserted that the principal balance of the loan is $6,804,393.08. See doc. #117, ¶8. This was calculated assuming that the post-default payments were applied to principal rather than default interest. See id. The Debtor called Joanna Johnson, the Debtor's bookkeeper, to testify as to her calculation of the loan balance. Johnson calculated two payoff figures prior to the hearing, one assuming no default and the other assuming some default

interest with house sale proceeds still going to principal.[5]  Debtor's Exhibit #22.  Johnson arrives at $7,264,206.88 and $7,394,691.50 respectively.  Id.  However, neither figure is relevant because both were calculated on the erroneous assumption that the Creditor was still obligated to apply sale proceeds to principal after the default.  Transcript, pp. 150-51.

Because neither party has submitted entirely credible numbers, I am forced to calculate the present claim amount myself.  To do this, I need three (3) figures; an initial principal balance, the accumulated default interest, and the total payments made by the Debtor since the application of default interest.

Despite the Debtor being in default on September 01, 2023, the Creditor's decision to apply the proceeds of a subsequent sale to principal indicates that the Creditor did not begin enforcing its rights under the original note until October 11, 2023.  Both the Debtor and the Creditor acknowledge the same principal amount owing in mid-October of 2023.[6]  Therefore, I find that the Debtor's balance due was $7,558,480.57 on October 11, 2023, and that default interest applies as of that date.

The Creditor indicated that default interest was calculated on a per diem basis. Transcript, p. 167.  23% interest on $7,558,480.57 yields $1,738,450.53 annually.  This sum divided by 365 results in a per diem rate of $4,762.88.[7]  The date of this valuation hearing was

---

[5] Johnson's calculation of "default interest" consists of simply adding a $144,898.31 amount due on October 15, 2023.  It is incredible that applying a 23% default rate for nearly a year would only increase the payoff amount by less than $200,000.00.  However, Johnson's figures are ultimately immaterial to my decision.

[6] The Debtor's records show a small amount going from suspense to principal on October 15, 2023, at which point the principal balance is identical to the Creditor's submission.

[7] This figure is supported by the Creditor's payoff statements, which alert the payee that payment requires an additional "$4,762.88 interest per day."  Creditor Exhibit #4.

September 25, 2024. See doc. #121. 350 days have passed from October 11, 2023, to September 25, 2024. Therefore, the total default interest accumulated in this time is $1,667,008.00.

The parties appear to agree on the total amount paid since October 11, 2023. When asked about the Creditor's accounting of the payments, Johnson agreed that no payments were unaccounted for on the Creditor's exhibit. Transcript, p. 149. I conclude that the Debtor has made payments totaling $857,587.49[8] since default interest began to accrue.

I find that the Debtor has paid $857,587.49 which was properly applied against the $1,667,008.00 owing in default rate interest. Therefore, $809,420.51 in interest remains unpaid. Along with the principal balance of $7,558,480.57, the Debtor's total payoff as of the valuation hearing is **$8,367,901.08**.[9]

## V. CONCLUSION

Based on the presentation of the parties and the evidence before me, I find that the portfolio of thirty-seven (37) homes at issue has a fair market value of $8,885,000.00. I also find that the Creditor has a claim secured by this property with a value as of September 25, 2024, of $8,367,901.08.

An order consistent with this Opinion will be entered.

**Date: October 30, 2024**

*Patricia M. Mayer*

**PATRICIA M. MAYER
U.S. BANKRUPTCY JUDGE**

---

[8] This sum is calculated based on the figures in Creditor Exhibit #2. This sum does not account for the $25,000.00 post-petition payment made by the Debtor in September 2024. See Debtor's Exhibit #22. Notably, ignoring the September 2024 payment, Debtor's Exhibit #22 indicates total payments summing to $3,500.00 less than the Creditor's numbers. Regardless of the reason for this discrepancy, I will apply the Creditor's amount both because the Debtor's witness agreed to the Creditor's accounting and because the larger sum benefits the Debtor.

[9] The Debtor has made and continues to make adequate protection payments. The figure in this Opinion does not account for the $25,000.00 payment made in September 2024 or the ongoing daily changes that result from continued interest and subsequent payments made by the Debtor after the date of the valuation hearing. The Creditor's payoff statement shows an unapplied $25,000.00 credit which appears to be the September payment; assuming that payment was finalized and applied, the payoff amount is $8,342,901.08.